**WO**                                                                      SM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Edward Lee Jones, Sr., | No.  CV 22-00277-PHX-MTL (JZB) |
| Plaintiff, | |
| v. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff Edward Lee Jones, Sr., who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman, Rynning Unit in Florence, Arizona, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  Before the Court are Defendants' Motion for Summary Judgment (Doc. 37)[1] and Motion to Strike Plaintiff's Response (Doc. 53).

The Court will grant the Motion to Strike, grant the Motion for Summary Judgment, and terminate the action with prejudice.

I.      **Screening of First Amended Complaint**

In his six-count First Amended Complaint (Doc. 13), Plaintiff names the following Defendants in their individual and official capacities: former Arizona Department of Corrections (ADC) Director David Shinn, Deputy Wardens Lori Stickley and Ronald H. Evans, Assistant Deputy Warden Edward W. Aplas, Count Movement/Special Security Unit Sergeant Ashlin, and Correctional Officer (CO) III Ulises A. Kiss.

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Doc. 39.)

On screening the First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment claims against Defendants Shinn, Stickley, Kiss, Aplas, and Ashlin in Counts One, Two, Three, Five, and Six, respectively. (Doc. 12 at 14–15.)  The Court directed these Defendants to answer the claims against them and dismissed the remaining claims and Defendants.  (*Id.*)  Defendant Ashlin was ordered to respond in his individual and official capacities, and the other Defendants were ordered to respond in their individual capacities only.  (*Id.* at 16.) Defendants now move for summary judgment based on failure to exhaust and on the merits.  (Doc. 37.)

## II.   Motion to Strike

Defendants move to strike Plaintiff's Response to the Motion for Summary Judgment because "although it is captioned as a response, it is actually a discovery motion filed in violation of the Court's scheduling order" and it does not comply with Federal and Local Rules of Civil Procedure, which require a separate statement of facts and specific citations to the record.  (Doc. 53 at 1 (citing Fed. R. Civ. P. 56, LRCiv. 56.1).)

Despite being advised of the requirements of a response and the consequences of failing to comply (Doc. 39), Plaintiff's Response does not address the substance of Defendants' Motion for Summary Judgment, and it does not include a separate or controverting statement of facts as specified in Federal Rule 56 and Local Rule 56.1. Instead, Plaintiff uses his Response to argue that he "has not had a fair opportunity to pursue discovery" and asks the Court to re-open discovery for 60 days "to complete the discovery process[.]"  (Doc. 52 at 1, 2.) Plaintiff previously moved the Court to re-open and/or extend the expired discovery deadline. (*See* Docs. 40, 48.) In denying those requests, the Court noted that Plaintiff failed to show good cause to re-open the now-expired deadlines and that "[t]he Court will not re-visit its previous ruling." (*See* Docs. 41, 49.)

To the extent Plaintiff seeks reconsideration of the Orders denying his requests to re-open discovery, reconsideration is inappropriate where a party merely asks the Court to "'rethink what the court ha[s] already thought through[,]'" which is exactly what Plaintiff does in his Response. *Defenders of Wildlife v. Browner*, 909 F. Supp. 1342, 1351 (D. Ariz.

1995); LRCiv. 7.2(g)(1) ("The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence.").

Plaintiff's attempt to submit a discovery motion, well after the expiration of the discovery motion deadline, and after already previously being denied similar requests, is unauthorized as well as redundant, immaterial, and impertinent.  Accordingly, the Motion to Strike will be granted, and Plaintiff's Response will be stricken from the record.  *See* Fed. R. Civ. P. 12(f) (a Court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."); LRCiv. 7.2(m)(1) ("a motion to strike may be filed . . . if it seeks to strike any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order.").

Because Plaintiff did not file a response or controverting statement of facts, the Court will consider Defendants' facts undisputed unless they are clearly controverted by Plaintiff's first-hand allegations in the verified First Amended Complaint (Doc. 11) or other evidence on the record.  Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

**III.   Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## IV. Relevant Facts

### A. Conditions-of-Confinement Claims (Counts One through Three)

In Counts One through Three, Plaintiff brings Eighth Amendment conditions-of-confinement claims against Defendants Shinn, Stickley, and Kiss, respectively.

Plaintiff was housed at the ASPC-Eyman, Special Management Unit (SMU) from November 2019 until August 2023, when he was transferred to the ASPC-Eyman, Rynning Unit; (Doc. 38, Defendants' Statement of Facts (DSOF) ¶ 3; *see* Doc. 46 (Notice of change of address).) In September 2020, Plaintiff was being careful, faithfully wearing his face mask, and keeping his hands washed, and two officials started providing chemicals to keep the ASPC-Eyman's Special Management Unit (SMU)-1 maximum custody prisoners' living areas and showers clean. (Doc. 13 at 12–13.) Plaintiff was given a COVID-19 test, and he tested negative. (*Id.* at 12.)

Plaintiff was moved to another pod in December 2020, where there was black mold on the vents in the cells, officials did not provide cleaning supplies, and a majority of the

officials did not wear masks and gloves while handling food and escorted prisoners without personal protective equipment, despite SMU's "hands on escort practices." (*Id.* at 13.) On December 6, 2020, while in this pod, Plaintiff was given a second COVID-19 test. (*Id.* at 12.) The entire pod, including Plaintiff, tested positive for COVID-19. (*Id.*)

On December 30, 2020, Plaintiff submitted an informal grievance alleging that cleaning supplies were not provided to him when he was transferred to his cell in the Baker Cluster, the showers were not being cleaned, and that staff were not wearing masks and gloves. (DSOF ¶¶ 41–42.) Defendant CO III Kiss received the informal grievance on January 8, 2021, and responded that same day, advising Plaintiff that:

> In response to your informal dated 12/30/20 I will attempt to answer your multiple concerns about informal processes/Covid/living conditions/staff/showers/ect. [sic] ADCRR is committed to providing inmates with clean living conditions. I will inform Shift commanders to remind their staff about the importance of wearing proper PPE [personal protective equipment] i.e. masks and gloves. Cleaning supplies are supplied to inmates on a regular schedule. We are committed to fighting the Covid [virus] by following CDC guidelines, and maintaining a clean and safe environment for residents and staff.

(DSOF ¶ 44; Doc. 38-1 at 135.)

Defendant Kiss did not have direct involvement in directing, controlling, or implementing the cell cleaning policy, nor did he have authority to order other officers to wear PPE, masks, or gloves. (DSOF ¶ 46.) Plaintiff asserts that Defendant Kiss was aware of the seriousness of COVID-19 and "could have t[aken] it upon himself to provide the requested cleaning supplies and cleaning tools, but did nothing." (Doc. 13 at 14.) Plaintiff also asserts that over a year later, no changes had been made, SMU maximum custody prisoners did not have access to cleaning supplies and tools to clean the showers, and SMU prisoners continued to contract COVID-19. (*Id.*) Plaintiff states that he contracted COVID-19 a second time. (*Id.*)

On January 12, 2021, Plaintiff filed a Formal Grievance appealing Defendant Kiss'

informal response.  (Doc. 38-1 at 134.)  Plaintiff complained that he was not provided cleaning supplies to sanitize his cell, the showers were not being cleaned, and that staff members were not wearing masks or gloves.  (*Id.*)  After reviewing Plaintiff's Formal Grievance, Defendant Deputy Warden Stickley investigated Plaintiff's complaints by speaking with operations staff and verifying that, in Wing 1, Baker cluster: (1) the showers were being cleaned once a week; (2) cleaning carts were available, and logs reflected that they were being used; (3) the living spaces were being cleaned by prisoner and staff cleaning crews, including using chemical cleaners; and (4) cleaning supplies and soap were being provided to prisoners.  (DSOF ¶ 54.)  On February 2, 2021, Defendant Stickley responded to Plaintiff's Formal Grievance and informed Plaintiff of the cleaning measures in place, the availability of cleaning materials, and that all prisoners and staff were reminded to wear face coverings and use proper PPE while on prison grounds.  (*Id.* ¶ 59.) Plaintiff asserts Defendant Stickley did not visit Plaintiff's pod or cell to verify whether her subordinates were actually following CDC guidelines, prisoners were actually being provided with cleaning supplies, living areas were actually being properly cleaned, or soap was actually being handed out and was readily available to prisoners.  (Doc. 13 at 10.)

On February 8, 2021, Plaintiff appealed Defendant Stickley's response to the ADC Director.  (DSOF ¶ 61.)  Plaintiff's appeal was reviewed by Appeals Office Staff at ADC's central office.  (*Id.* ¶ 62.)  Appeals Office staff investigated Plaintiff's appeal and verified that a review was conducted of SMU's cleaning practices, which confirmed that showers were being cleaned with disinfectant chemicals once a week, cleaning carts were available and being used, and that disinfectant chemicals were also being used to clean common areas and food traps.  (*Id.* ¶ 63.)  The investigation also confirmed that cleaning supplies (both disinfectant chemicals and hand soap) were being provided to prisoners.  (*Id.*)  The March 24, 2021, response to Plaintiff's Grievance Appeal was signed by Appeals Officer Melinda Stephan and by Deputy General Counsel C. R. Glynn.  (*Id.* ¶ 64.)

Plaintiff asserts that, after he filed his grievance, SMU staff continually failed to provide cleaning supplies to prisoners, food carts and cell door traps were not cleaned and

1    sanitized, and free soap was passed out only once in 2022 and twice a month in 2021,
2    despite COVID-19 "still being a[n] issue." (Doc. 13 at 6–7.) Plaintiff states that, although
3    the showers get cleaned weekly, they are used daily, and that the weekly cleaning of the
4    pods consists of them being quickly swept and occasionally mopped. (*Id.* at 7.) During
5    his deposition, Plaintiff testified that, in 2021, bars of soap were being handed out to
6    prisoners "every two or three weeks." (Doc. 38-1 at 34, Pl. Depo. at 31:22–32:1.)

7        Plaintiff asserts Defendant Shinn did not attempt to verify whether officials and staff
8    at SMU were "properly documenting accur[]ate information," such as by reviewing
9    surveillance camera footage to confirm the information in the cleaning cart logs and
10   whether the SMU administration was ensuring its staff and officials were "actually
11   following" ADC regulations and were "doing everything within their authority," as they
12   claimed to be doing. (Doc. 13 at 6.) Plaintiff alleges Shinn relied on hearsay and proceeded
13   as though the information provided by his subordinates could not be falsified. (*Id.*)

14       Plaintiff asserts Defendant Shinn's response to the appeal was deliberately
15   indifferent, and his acts and omissions resulted, and continue to result, in deliberate
16   indifference to Plaintiff's health and safety. (*Id.* at 7.) Plaintiff claims Defendant Shinn's
17   inaction included a failure to instruct his subordinates on proper procedures for maintaining
18   sanitary living conditions. (*Id.*) Plaintiff alleges that, because of Defendant Shinn's
19   deliberate indifference, he was forced to live in unsanitary living conditions, was forced to
20   live with roaches and rodents, and contracted COVID-19 twice. (*Id.* at 5.)

21       Plaintiff also contends Defendant Shinn and others "lack due care" for prisoners'
22   health and safety and intentionally failed to provide sanitary living conditions. (*Id.* at 8.)
23   Plaintiff claims, "there is a blatant failure to provide [prisoners at SMU] with a
24   rod[e]nt/pest free environment" and that officials and staff at SMU intentionally fail to
25   "follow the law" and prison regulations regarding cleaning procedures. (*Id.*) Plaintiff
26   alleges this has been occurring for three years and is ongoing. (*Id.*)

27       **B.    Threat-to-Safety Claims (Counts Four and Five)**
28       In Counts Four and Five, Plaintiff brings Eighth Amendment threat-to-safety claims

against Defendants Aplas and Ashlin, respectively, concerning his housing with a severely mentally ill (SMI) prisoner.

ADC policy requires that in order for prisoners to be housed together, they be "matched" based on certain characteristics.  (DSOF ¶ 66.)  Prisoner matches are evaluated through the Arizona Correctional Information System (ACIS) which looks at several factors set forth in Department Order 704, including: custody level/internal risk metrics; years to release; severity of underlying conviction; security threat group status; protective custody status; Do Not House With (DNHW) restrictions; disciplinary history; medical/mental health scores; sex offender status; age; height/weight; and race.  (*Id.* ¶ 67.)  A prisoner's SMI status is not a factor in whether to house him with another prisoner.  (*Id.* ¶ 68.)  It is not unusual for SMI prisoners to be housed with non-SMI prisoners, particularly in the higher custodial levels, like the prisoner population at SMU.  (*Id.* ¶ 69.)

Defendant Ashlin is not responsible for approving or denying a prisoner's DNHW requests.  (*Id.* ¶ 73.)  A prisoner inmate can submit a DNHW request by making a request to a CO III or CO IV.  (*Id.*)  The request is investigated by the Special Security Unit (SSU) and is either recommended or denied by the Deputy Warden or Warden.  (*Id.*)  A final decision is made by the Protective Custody Unit at the ADC Central Office.  (*Id.*)

In 2021 and 2022, because of the limited number of available housing assignments, most cells in SMU, other than detention cells, housed two prisoners.  (*Id.* ¶ 74.)  Prisoners were double bunked whenever possible.  (*Id.*)  Prisoner Isaiah Crunk was housed in Wing 4, D104B from October 27, 2021, through March 1, 2022.  (*Id.* ¶ 75.)  On November 30, 2021, Crunk was disciplined for fighting with another prisoner, and they were separated. (*Id.*)  Defendant Ashlin ran a search in ACIS for compatible prisoners to house with Crunk, and Plaintiff matched.  (*Id.* ¶ 76.)  Because they matched in ACIS, Plaintiff and Crunk were housed together.  (*Id.* ¶ 77.)  The housing placement was approved at the Deputy Warden level, as required due to Plaintiff and Crunk's custody status.  (*Id.* ¶ 78.)

Because Crunk was a Maximum Custody sex offender, there were few possible prisoners who could house with him. (*Id.* ¶ 79.) When Plaintiff was placed with Crunk,

neither of them had a DNHW restriction preventing them from being housed together.  (*Id.* ¶ 80.)  Plaintiff never applied for a DNHW restriction with respect to Crunk.  (*Id.* ¶ 81.)

On December 2, 2021, shortly after Defendant Ashlin, acting as "count movement," moved Plaintiff's former cellmate to a different cell, Plaintiff was also moved to a different cell with Crunk, who had been in a physical altercation with his own former cellmate earlier that day. (Doc. 13 at 18.)  In their shared cell, Crunk ignored Plaintiff and began pacing and conversing with "voices within [Crunk's] own mind."  (*Id.*)  Plaintiff verbally requested to move cells 48 hours later, informing his caseworker that he was not SMI and asking why "count movement" continuously housed him with prisoners who had been classified as SMI and who SMU administration knew had "prior documented issues with a majority, if not all[,] of their former cell[]mates."  (*Id.* at 18-19.)

Plaintiff asserts the living conditions became progressively worse, "some days elevating to levels of the possibility of physical altercations" between Plaintiff and his SMI cellmate.  (*Id.* at 19.)  Plaintiff alleges he submitted an inmate letter seeking a "keep away" on the SMI cellmate because Plaintiff wanted to avoid a physical confrontation or the possibility of receiving a disciplinary infraction that could keep him confined in maximum custody.  (*Id.*)  Plaintiff contends that "under normal circumstances," when a prisoner requests a "keep away," the two prisoners are immediately separated.  (*Id.* at 20.)  Plaintiff claims this did not occur.  (*Id.*)

Plaintiff asserts he submitted several single-page inmate letters to Defendant Ashlin, "explaining the situation and circumstances" and "requesting over and over" to be moved or to be housed with a prisoner who was not classified as SMI.  (*Id.*)  Plaintiff claims he even submitted several inmate letters "with other inmates" who were willing to house with Plaintiff.  (*Id.*)  Plaintiff also contends he became desperate and submitted health needs requests to the mental health department, requesting assistance in obtaining an emergency move.  (*Id.*)  Defendant Ashlin asserts that he did not receive any inmate letters from Plaintiff regarding his housing placement with Crunk.  (DSOF ¶ 83.)  Defendant Ashlin looked into separating Plaintiff and Crunk when he was told by another CO that Plaintiff

had asked to move cells because of disagreements with Crunk.  (*Id.* ¶ 84.)  At the time, there was no capacity to move Plaintiff or Crunk within SMU, so Defendant Ashlin was not able to separate them.  (*Id.* ¶ 85.)

On December 12, 2021, Plaintiff filed an informal complaint asking to be moved to a cell with a non-SMI prisoner.  (*Id.* ¶ 91; Doc. 38-1 at 148.)  The informal complaint was reviewed by CO IV Michelet Smith, and not by Defendant Ashlin.  (DSOF ¶ 91; Doc. 38-1 at 147.)  In response, CO IV Smith advised Plaintiff of the factors that are considered when assigning cellmates and informed Plaintiff that based on these factors, Plaintiff and Crunk were found to be compatible.  (Doc 38-1 at 147.)  Plaintiff appealed CO IV Smith's response in a Formal Grievance dated December 28, 2021, and on January 1, 2022, Defendant Associate Deputy Warden Aplas responded:

> Investigation was conducted into your claims of condition of confinement. . . . A cell screening was conducted between you and your assigned cell mate [sic] which yielded a match per [ADC policy].  This placement has been reviewed by the COIV and/or Captain and approved by the unit Deputy Warden or designee per [ADC policy].

(*Id.* at 145.)  Defendant Aplas was not aware of any specific safety issues between Plaintiff and Crunk.  (DSOF ¶ 98.)  Neither Plaintiff nor Crunk had been identified to be fighting each other or at risk for fighting each other.  (*Id.*)  Defendant Aplas determined, based on his investigation, that Plaintiff's placement with Crunk was appropriate and consistent with ADC policy.  (*Id.* ¶ 99.)  Both prisoners were maximum security sex offenders with similar amounts of time to release and similar security levels.  (*Id.*)  At the time of Plaintiff's Formal Grievance, there was not a viable option to relocate him and/or Crunk or to separate them.  (*Id.* ¶ 100.)  Moving either of the prisoners at that time would have involved relocating another prisoner's cellmate and finding an appropriate housing assignment for him.  (*Id.*)  This was not possible at the time.  (*Id.*)

Plaintiff appealed Defendant Aplas' decision on January 17, 2022.  (Doc. 38-1 at 142–144.)  Appeals Office Staff investigated the appeal and found the housing assignment was consistent with ADC's housing policy.  (*Id.* ¶ 103.)  In addition, the Central Office

investigated Plaintiff's claim that he had submitted a DNHW request and found that no such request had been submitted, and there were no documented incidents which would justify implementing such a request. (*Id.*) The response to Plaintiff's Grievance Appeal was signed by Appeals Officer Melinda Stephan and by Legal Access Monitor Loresa Purden, who were authorized by the Director to sign responses to grievance appeals. (*Id.* ¶ 104.) Defendant Shinn was not involved in the investigation or resolution of this grievance, and it was not brought to his attention. (*Id.* ¶ 105.)

On March 1, 2022, when there was room to separate them, Plaintiff and Crunk were transferred to different cells. (*Id.* ¶ 86.)

All in all, Plaintiff and Crunk were housed together for three months, from November 30, 2021, to March 1, 2022. (*Id.* ¶ 88.) During that time, there were no disciplinary infractions between them. (*Id.*) At his deposition, Plaintiff testified that he and Crunk did not have a physical altercation during while they were housed together and that he did not suffer a physical injury from being housed with Crunk. (*Id.* ¶¶ 89, 90.)

Plaintiff asserts that his requests to be moved were continuously denied. (Doc. 13 at 20.) Plaintiff claims Defendant Ashlin was deliberately indifferent to Plaintiff's safety and wellbeing when he refused to move Plaintiff or Crunk and ignored the requests by Plaintiff and other prisoners to house together. (*Id.* at 21.) Plaintiff asserts that, instead of "accommodating" Plaintiff, Defendant Ashlin "simply and intentionally" moved the prisoners who were willing to house with Plaintiff out of the pod "to eliminate that option[] and force" Plaintiff to house with the SMI prisoner. (*Id.*)

Plaintiff states that Defendant Ashlin, "on behalf of [SMU's] administration," continues to create stressful living conditions for Plaintiff by continuously housing him with SMI prisoners who hear voices, have "hollering" episodes and bad hygiene, and are suicidal, "among other issues." (*Id.* at 22.) Plaintiff asserts that Defendant Ashlin and other SMU officials claim that they are following ADC regulations and that Plaintiff is "compatible" with these SMI prisoners, but "in reality," the SMI prisoners are treated "wholly different" than non-SMI prisoners. (*Id.* at 22.)

Plaintiff asserts that even when there is a "clear understanding of there being a housing issue," Defendant Ashlin and the SMU staff, "in deliberate indifference and to avoid resolving these issues," tell prisoners that (a) they do not get to dictate where they are housed and (b) prisoners are compatible "if the computer says the[y're] compatible." (*Id.* at 23.)  Plaintiff contends this forces him to live in hostile atmospheres with a heightened risk of having to engage in physical altercations.  (*Id.*)  Plaintiff states that this has caused him mental stress and to lose sleep, weight, and the opportunity to be reclassified to a lower custody level.  (*Id.* at 18.)  He also claims this has caused him to have physical altercations with prior SMI cellmates.  (*Id.*)

## V.    Exhaustion of Administrative Remedies

Defendants first argue that Plaintiff failed to exhaust the portion of his Eighth Amendment claims in Counts One through Three wherein he alleged that there was black mold, rodents, and other pests in his pod.  (Doc. 37 at 12–13.)

### A.    Legal Standard

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court.  *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005).  The prisoner must complete the administrative review process in accordance with the applicable rules.  *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it.  *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process).  Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there

1   is something in his particular case that made the existing and generally available

2   administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The

3   ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate

4   if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a

5   failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

6       If summary judgment is denied, disputed factual questions relevant to exhaustion

7   should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of

8   exhaustion. *Albino*, 747 F.3d at 1170-71. If a court finds that the prisoner exhausted

9   administrative remedies, that such remedies were not available, or that the failure to

10  exhaust administrative remedies should be excused, the case proceeds to the merits. *Id.* at

11  1171.

12      **B.    ADC Grievance Procedure**

13      ADC's grievance process is set forth in Department Order (DO) 802. (DSOF ¶ 19.)

14  During the time Plaintiff's claims in this action arose, the first step in the grievance process

15  for non-medical complaints was for the prisoner to attempt to resolve the issue informally.

16  (*Id.* ¶ 20.) If the prisoner was unable to resolve the complaint informally, the next step of

17  the grievance procedure required the prisoner to file an Informal Grievance Form within

18  10 days of the action that caused the complaint. (*Id.* ¶ 21.) If the prisoner was dissatisfied

19  with the response at this stage, the prisoner had 5 days from receipt of the response to the

20  Informal Grievance Form to file a Formal Grievance with the Grievance Coordinator, who

21  would forward it to the Deputy Warden for a response. (*Id.* ¶ 23.) If the Prisoner was not

22  satisfied with the Deputy Warden's response, the prisoner had 5 days to file an appeal to

23  the ADC Director. (*Id.* ¶ 24.) DO 802 authorizes the Director to delegate signature

24  authority for all Grievance Appeals. (*Id.* ¶ 25.) During the relevant time, the Director

25  delegated signature authority for responses to Inmate Grievance Appeals to the General

26  Counsel's office. (*Id.* ¶ 27.)

27      **C.    Discussion**

28      On this record, Defendants have met their burden of showing that there was an

administrative remedy available under DO 802 for Plaintiff to exhaust his claims. Defendants have also presented evidence showing that Plaintiff did not complete the grievance process with respect to his allegations of mold, rats, and pests in his housing unit. The undisputed facts show that Plaintiff exhausted his claims regarding lack of cleaning supplies, showers not being cleaning, staff refusing to wear PPE, and being housed with an SMI prisoner. But there is no evidence that Plaintiff submitted any grievances complaining about mold, rats, or pests in his unit. Moreover, Plaintiff has not presented evidence to refute Defendants' evidence that he failed to exhaust these claims, and he has not presented evidence showing that the grievance process was unavailable to him. Accordingly, the portion of Plaintiff's conditions-of-confinement claim wherein he complains about mold, rodents, and other pests in his housing unit is dismissed for failure to exhaust.

## VI.    Conditions-of-Confinement (Counts One through Three)

### A.    Legal Standard

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. *Morgan*, 465 F.3d at 1045. Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. *See Farmer*, 511 U.S. at 832; *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).

To state an Eighth Amendment claim, a plaintiff must meet a two-part test. First, the plaintiff must make an "objective" showing that the alleged deprivation is "sufficiently serious." *Farmer*, 511 U.S. at 834. To be sufficiently serious to form the basis of an Eighth Amendment violation, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id.* (citing *Rhodes*, 452 U.S. at 347). Second, the plaintiff must make a "subjective" showing that the prison official acted with

1    a "sufficiently culpable state of mind"; that is, that the defendant acted with deliberate
2    indifference to the plaintiff's health or safety. *Farmer*, 511 U.S. at 834. To show deliberate
3    indifference, the plaintiff must establish that the defendant knew of and disregarded an
4    excessive risk to prisoner health or safety. *Id.* at 837. To satisfy the knowledge component,
5    "the official must both be aware of facts from which the inference could be drawn that a
6    substantial risk of serious harm exists, and he must also draw the inference." *Id.* Deliberate
7    indifference is a higher standard than negligence or lack of ordinary due care for the
8    prisoner's health or safety. *Id.* at 835.

9         Prison officials may avoid Eighth Amendment liability for the prisoner harm if they
10   show that: (1) "they did not know of the underlying facts indicating a sufficiently
11   substantial danger and that they were therefore unaware of a danger"; (2) "they knew the
12   underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise
13   was insubstantial or nonexistent"; or (3) they responded reasonably to the risk. *Id.* at 844.

14        **B.    Discussion**

15        A complete denial of personal hygiene items violates the Eighth Amendment. *See*
16   *Keenan v. Hall*, 83 F.3d 1083, 1089-91 (9th Cir. 1996) (finding a disputed issue of fact
17   where the plaintiff alleged the defendants gave him personal hygiene items only when he
18   could pay for them and that his indigency forced him to choose between hygiene items and
19   legal supplies). Subjecting a prisoner to lack of sanitation that is severe or prolonged can
20   also rise to the level of a constitutional deprivation. *Anderson v. Cnty. of Kern*, 45 F.3d
21   1310, 1314 (9th Cir. 1995) ("Unquestionably, subjection of a prisoner to lack of sanitation
22   that is severe or prolonged can constitute an infliction of pain within the meaning of the
23   Eighth Amendment"). Prison officials must provide prisoners with adequate sanitation.
24   *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). If a prison official's refusal to
25   provide adequate cleaning supplies prohibits inmates from maintaining minimally sanitary
26   cells and thereby threatens their health, it amounts to a constitutional violation. *See*
27   *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985).

28

### 1.    Objective Prong

Plaintiff's conditions-of-confinement claim is based on the alleged lack of cleaning supplies, failure to clean the showers, and prison staff's failure to wear masks and gloves. Plaintiff admitted during his deposition that the showers in his unit were cleaned once per week during the relevant time.  "[R]outine discomfort" is "part of the penalty that criminal offenders pay for their offenses against society."  *Hudson v. McMillan*, 503 U.S. 1, 9 (1992).  Weekly shower cleanings do constitute an *extreme* deprivation that would constitute a denial of the minimal civilized measure of life's necessities.  *See id.* ("[E]xtreme deprivations are required to make out a conditions-of-confinement claim."). As such, this portion of Plaintiff's claim is not objectively sufficiently serious to amount to an Eighth Amendment violation and will be dismissed.

However, construing the facts in Plaintiff's favor, assuming that cleaning supplies were not readily available to prisoners, and staff members were not complying with PPE requirements, a reasonable jury could find that these conditions created a substantial risk of harm when considered within the context of the COVID-19 pandemic that was ongoing at the time.  Therefore, the Court must consider whether Defendants' responses amounted to deliberate indifference.

### 2.    Subjective Prong

When analyzing deliberate indifference, the inquiry "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.1988); *see Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976). On this record, the evidence does not show that Defendants Shinn, Stickley, and Kiss were aware of a substantial risk of harm to Plaintiff and that each Defendant failed to act.

With respect to Defendant Shinn, the evidence shows that Plaintiff submitted a Grievance Appeal to the ADC Central Office regarding the lack of cleaning supplies, the staff's failure to wear masks and gloves, and the failure to clean the showers in his unit. However, the undisputed facts show that Defendant Shinn did not personally review,

investigate, or respond to the Grievance Appeal.  Those duties were delegated to subordinate staff who responded on his behalf.  Absent facts showing that Defendant Shinn was aware of facts that would have led to an inference that a substantial risk of harm existed, and that he actually drew such an inference, summary judgment must be granted as to the conditions-of-confinement claim against Defendant Shinn.

As to the claims against Defendants Kiss and Stickley, the evidence shows that their only involvement with Plaintiff were their responses to his administrative grievances.  As previously stated, a defendant may avoid Eighth Amendment liability if the defendant believed that the risk of harm was insubstantial or nonexistent or if the defendant reasonably responded to the risk.  *Farmer*, 511 U.S. at 844.  This record supports such a finding with respect to Defendants Kiss and Stickley.

Upon receiving Plaintiff's informal grievance, Defendant Kiss told the shift commanders to remind their staff about the importance of wearing proper PPE, and he advised Plaintiff that cleaning supplies were given to prisoners on a regular schedule. (DSOF ¶ 44; Doc. 38-1 at 135.)  Defendant Kiss did not have authority to order other officers to wear PPE, masks or gloves, and he was not responsible for directing or implement the unit's cell cleaning policy.  (DSOF ¶ 46.)  Based on his personal knowledge and his particular duties and responsibilities, the record does not show that Defendant Kiss drew an inference that Plaintiff was at risk of substantial harm, and the facts do not show that Defendant Kiss' response to Plaintiff's informal grievance was unreasonable. Therefore, the claim against Defendant Kiss is dismissed.

Likewise, when Defendant Stickley received Plaintiff's formal grievance, she spoke with the operations staff, who advised her that the showers in Plaintiff's unit were being cleaned once a week; cleaning carts were available to, and being used by, the prisoners; the living spaces were being cleaned by prisoner and staff cleaning crews with chemical cleaners; and cleaning supplies and soap were being provided to prisoners.  (DSOF ¶ 54.) This response to Plaintiff's complaint was not unreasonable.  Based on the information gathered during her investigation, Defendant Stickley did not draw an inference  that

1   Plaintiff faced a substantial risk of harm.  Even if the information provided to Defendant
2   Stickley during her investigation was untrue or inaccurate, there is no evidence in the
3   record to show that Defendant Stickley knew or should have known that the information
4   was untrue or inaccurate.  Accordingly, summary judgment will also be granted in favor of
5   Defendant Stickley.

6   **VII.   Threat-to-Safety (Counts Four and Five)**

7        **A.   Legal Standard**

8        Under the Eighth Amendment, prison officials must take reasonable measures to
9   guarantee the safety of prisoners.  *Farmer*, 511 U.S. at 832.  In particular, prison officials
10  have an affirmative duty "to protect prisoners from violence at the hands of other
11  prisoners." *Id.* at 832.  A prison official's failure to protect a prisoner from attacks by other
12  prisoners violates the Eighth Amendment only when two elements are met: (1) the
13  objective element, which requires a prisoner to show that the complained of conditions
14  posed a "substantial risk of serious harm"; and (2) the subjective element, which requires
15  a prisoner to show that the defendant was deliberately indifferent to that risk.  *Farmer*, 511
16  U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 297–98 (1991)).  A prison official is
17  deliberately indifferent "if he knows that inmates face a substantial risk of serious harm
18  and [he] disregards that risk by failing to take reasonable measures to abate it." *Farmer*,
19  511 U.S. at 844.

20       Under the objective prong, "[w]hat is necessary to show sufficient harm for the
21  purposes of the Cruel and Unusual Punishment Clause depends on the claim at issue."
22  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). For a failure-to-protect claim, the prisoner
23  must show that he was placed into conditions that posed a substantial risk of serious harm.
24  *Farmer*, 511 U.S. at 834. A prisoner need not wait until he is actually assaulted to bring an
25  Eighth Amendment claim, *see id*, 511 at 845; however, "[g]eneral intimidation,
26  harassment, and nonspecific threats . . . do not demonstrate a constitutionally intolerable
27  risk of harm." *Chandler v. Amsberry*, No. 3:08-CV-00962-SI, 2014 WL 1323048, at *7
28  (D. Or. March 28, 2014) (citing cases).

1    The subjective prong requires "more than ordinary lack of due care for the prisoner's

2    interest or safety." *Farmer*, 511 U.S. at 835 (quotation omitted).  To prove deliberate

3    indifference, a plaintiff must show that the official knew of and disregarded an excessive

4    risk to prisoner safety; the official must both be aware of facts from which the inference

5    could be drawn that a substantial risk of serious harm exists, and the official must also draw

6    the inference. *Id.* at 837.  But the plaintiff need not show that the defendant acted or failed

7    to act believing that harm would actually befall the prisoner; "it is enough that the official

8    acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at

9    842.  To prove knowledge of the risk, the plaintiff may rely on circumstantial evidence; in

10   fact, the very obviousness of the risk may be sufficient to establish knowledge.  *Id.*

11   In addition, a plaintiff alleging deliberate indifference must "demonstrate that the

12   prison official's actions were both an actual and proximate cause of [his] injuries." *Lemire*

13   *v. Cal. Dep't of Corrs. and Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013).  "The requisite

14   causal connection can be established not only by some kind of direct personal participation

15   in the deprivation, but also by setting in motion a series of acts by others which the actor

16   knows or reasonably should know would cause others to inflict the constitutional injury."

17   *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978).

18   Finally, prison officials who actually knew of a substantial risk to prisoner health or

19   safety may be found free from liability if they responded reasonably to the risk, even if the

20   harm ultimately was not averted.  *Farmer*, 511 U.S. at 844.  Prison officials do not escape

21   liability, however, if the evidence shows that that they "merely refused to verify underlying

22   facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that

23   [they] strongly suspected to exist."  *Id.* at 843 n.8.

24   **B.    Discussion**

25   **1.    Objective Prong**

26   Prisoners do not enjoy a constitutional right to the cellmate of their choice.  *See*

27   *Allen v. Purkett*, 5 F.3d 1151, 1153 (8th Cir. 1993) (per curiam) (no due process right to be

28   housed with certain prisoners); *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984) ("an

1    inmate has of course no constitutional right to the cellmate . . . of his choice.").  This is so

2    even if a prisoner's cellmate is "annoying, offensive, strange, rude," or an otherwise

3    undesirable living companion. *Blue v. Knowlin*, No. 2:09-1629 CMCRSW, 2009 WL

4    2843315, at *4 (D. S.C. Aug. 31, 2009).

5          Here, the record does not support a finding that Plaintiff was placed into conditions

6    that posed a substantial risk of serious harm.  There is no evidence that Crunk directed

7    specific threats towards Plaintiff before them being housed together, and there are no facts

8    showing that Plaintiff and Crunk were involved in any previous altercations.  As discussed,

9    general harassment or intimidation does not amount to a substantial risk of harm for Eighth

10   Amendment purposes. *Chandler*, 2014 WL 1323048, at *7; *see Williams v. Wood*, 223 Fed.

11   App'x 670, 671 (9th Cir. 2007) ("[S]peculative and generalized fears of harm at the hands

12   of other prisoners do not rise to a sufficiently substantial risk of serious harm to [plaintiff's]

13   future health.") Crunk's SMI status and odd behavior are not sufficient to satisfy the

14   objective prong of the deliberate indifference analysis. Although a prisoner does not have

15   to wait until he is actually assaulted to bring an Eighth Amendment claim, the fact that

16   Plaintiff and Crunk shared a cell for three months without incident undercuts Plaintiff's

17   argument that he faced a substantial risk of harm based solely on Crunk's SMI status.

18                    **2.      Subjective Prong**

19         Moreover, the record does not show that Defendants Aplas and Ashlin knew of and

20   disregarded an excessive risk to Plaintiff's safety.  There is no evidence that Defendants

21   Aplas and Ashlin were aware of any specific safety concerns between Plaintiff and Crunk.

22   Plaintiff's general complaints about being housed with Crunk because of his SMI status

23   were not sufficient to put Defendants or other officials on notice of a substantial risk of

24   harm.  Further, because Crunk was involved in an altercation with his previous cellmate

25   was insufficient to place Defendants on notice that Crunk would have posed a specific risk

26   to Plaintiff.  *See Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1161 (9th Cir. 2013)

27   (finding in the case of a plaintiff who brought an Eighth Amendment claim after being

28   assaulted by his cellmate, "[t]he added fact that [plaintiff] had fought three days earlier

with a member of [his cellmate's] gang [was] not a basis to find deliberate indifference" where that fight was not gang-related).  Absent any evidence that Crunk posed a specific risk to Plaintiff's safety and that Defendants Aplas and Ashlin deliberately disregarded that risk, Plaintiff's claims against them fail. *See id.* ("The record, viewed objectively and subjectively, is insufficient to preclude summary judgment on the claim that . . . prison officials were deliberately indifferent to a substantial risk that" one prisoner would assault another, since the two prisoners in question "had been in general population together for an extended period with no record of any threats or problems between them."). Accordingly, summary judgment will be granted to Defendants Aplas and Ashlin.[2]

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 37) and Motion to Strike (Doc. 53).

(2)     The Motion to Strike (Doc. 53) is **granted**, and the Clerk of Court must **strike** from the record Plaintiff's Response at Doc. 52.

(3)     Defendants' Motion for Summary Judgment (Doc. 37) is **granted**, and the Clerk of Court must terminate the action **with prejudice** and enter judgment accordingly.

Dated this 26th day of December 2023.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge

---

[2] No constitutional violation has been found; the Court will not address Defendant Ashlin's qualified immunity argument. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (in deciding whether qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation).